[Civ. No. 19805. Second Dist., Div. Three. Feb. 24, 1954.]

WALTER S. FORMAN et al., Appellants, v. DELAWARE CONSTRUCTION COMPANY (a Corporation), Respondent.

Arthur R. Hemm for Appellants.

Musick & Burrell for Respondent.

SHINN, P. J.—Plaintiffs brought this action on their own behalf and on behalf of numerous other persons alleged to be similarly situated for the purpose of obtaining a declaratory judgment defining the rights and duties of the parties under certain contracts to purchase dwelling houses from defendants. An answer was filed by defendant and also a cross-complaint by which defendant sought to recover damages.

When the action came on for trial judgment was entered in favor of defendant, which recited that a general demurrer had been sustained to the complaint with leave to amend within 10 days, and that plaintiffs had not amended. Plaintiffs appeal.

The complaint alleged the following facts: On or about April 4, 1947, defendant was the owner of a tract of land in Los Angeles County; it filed its Notice of Intention to Sell and Answer to Questionnaire with the Real Estate Commissioner; thereby it represented that it intended to sell certain houses to be built on the land at a price of $10,000 for single houses and $14,000 for double houses and that sales would be made for a down payment of $1,000 or 10 per cent of the purchase price and monthly payments of $66.91 including principal, interest, taxes and insurance, the rate of interest to be 4 to 4½ per cent with F.H.A. and G.I. financing. It was alleged that defendant did not file with the commissioner a form of contract that it intended to use in the sale of the houses. Without notice to the commissioner defendant proceeded to sell and dispose of certain houses for from $10,500 to $12,750 each with down payments of $1,000 to $2,500 and monthly payments of from $75 to $116 with interest at the rate of 6 to 6½ per cent; other charges were made for mortgage insurance, taxes and fire insurance. Plaintiff Forman agreed to pay $12,300 for a house and plaintiffs Coffey agreed to pay $12,864.73 for a house they purchased. Other purchasers to the number of 135 entered into contracts of purchase with defendant at prices substantially above the prices named in the above mentioned Answer to Questionnaire. It was alleged that a controversy existed between the several buyers and the defendant with respect to the validity of the contracts of purchase. Plaintiffs claimed they were

illegal because of the failure of defendant to comply with the requirements of law regulating the sale of real estate subdivisions, and the complaint listed numerous rights which the owners would have in case the contracts were void. It did not allege the existence of any controversy which did not depend upon the claimed invalidity of the contracts. It was alleged that the defendant disputed all the claims and rights asserted by the several purchasers. The answer of defendant admitted that it had not filed with the Real Estate Commissioner a form of contract that it intended to use in the sale of houses and lots, and it denied that in its Answer to Questionnaire it represented that it would or that it did offer to sell single houses or double houses for the prices and upon the terms alleged in the complaint. It admitted that a controversy existed between plaintiffs and itself as to the legality of the contracts, the plaintiffs claiming them to be void and defendant claiming them to be valid and enforceable. Defendant also filed a cross-complaint accusing plaintiffs and others with having conspired to involve it in litigation and to harass and annoy it for the purpose of avoiding their obligations under the contracts, and obtaining other unfair advantages as the price of peace, for all of which defendant asked for compensatory and punitive damages.

Since the action was dismissed on defendant's motion after its demurrer was sustained, trial of the issues raised by the cross-complaint and answer thereto was waived.

In final analysis the only question is whether defendant was required to comply with the requirements of law respecting the sale of subdivided lands. The law on the subject is found under the heading "Subdivided Lands," sections 11000 to 11021, Business and Professions Code. At the time of the transactions in question section 11000, added by Statutes 1943, page 862, read as follows: " 'Subdivided lands' and 'subdivision' refer to land or lands divided or proposed to be divided for the purpose of sale or lease, whether immediate or future, into five or more lots or parcels." One intending to sell such subdivided lands was required to file with the commissioner a notice of intention to sell containing, among other statements, "A true statement of the terms and conditions on which it is intended to dispose of the land, together with copies of any contracts intended to be used." (§ 11010, subd. (e).) It was made unlawful for the seller to materially change the setup of the offering without notifying the commissioner thereof in writing. Other pro-

visions of the law required inspection of the project by the commissioner, a public report of his findings, and imposed upon the commissioner a duty to issue an order prohibiting the sale or lease of the property if the same would constitute misrepresentation to or deceit or fraud of the purchasers of "lots or parcels in the subdivision." Violating of any of the provisions of law on the subject is made a criminal offense punishable by fine and imprisonment in the county jail. (§ 11020.)

On April 10, 1946, it was held in *People* v. *Embassy Realty Associates*, 73 Cal.App.2d 901 [167 P.2d 797], that the word "subdivision" as used in sections 11000 and 11010 meant unimproved property. After quoting dictionary definitions of "subdivide" as "to divide a tract of land into lots to sell before developing or improving them" and a "subdivision" as "an unimproved tract of land surveyed and divided into lots for purposes of sale," and citing supporting authorities, the court said (p. 906) : "In view of the foregoing, it would appear that in referring to a subdivision, the courts of this state have had in mind the generally accepted meaning of the word, i.e., *the division of a large tract of unimproved land or acreage into smaller lots or parcels. . . .* Respondent has not directed attention to any authority in which the term subdivision has been used in referring to improved city lots, such as the property here under consideration." The property there involved was a bungalow court. The plan was to organize a corporation and sell stock to individuals who would thereby become entitled to lease one of the bungalows at a nominal rent for a period of 99 years. However, neither the fact that the plan was to dispose of the property by long term leases, rather than by outright sales, nor the fact that the land was already improved was a factor in the decision. The only ground of the decision was that the sections of the law in question did not relate to improved city lots, and for that reason it was not necessary for Embassy to procure a permit from the State Real Estate Commissioner before proceeding with its plan.

The decision in the Embassy case no doubt came to the attention of the Legislature. By Statutes 1947, chapter 454 and also chapter 1445, section 11000 was amended, the pertinent language of each amendment being " 'Subdivided lands' and 'subdivision' refer to improved or unimproved land or lands divided or proposed to be divided for the purpose of

sale or lease, whether immediate or future, into five or more lots or parcels.'' Thus the sale or lease of subdivided lands after they had been improved was brought under the supervision of the commissioner. Chapter 454 provided that the amendment of section 11000 should go into immediate effect for reasons stated as follows: ''Due to the prevailing housing shortage, various schemes for the subdividing of bungalow courts and other similar property are being promoted and offered to the public by real estate operators without the safeguards which a permit from the Real Estate Commissioner would provide. It is essential for the protection of the public that such matters be subjected to regulation and control without delay.'' The amendment became effective May 31, 1947. According to the allegations of the complaint defendant's plan, and its operations thereunder, had gone into effect before the amendment became effective. Defendant therefore was not required to proceed under the law which governed the sale and lease of unimproved subdivided lands. Plaintiffs did not allege that it was any part of defendant's plan to sell unimproved lots or parcels. To the contrary the allegations were that the sales in question were of lots improved with dwellings. It is not contended by plaintiffs that the 1947 amendments were retroactive.

The record discloses that the demurrer was sustained upon the ground that the complaint failed to state a cause of action. It was properly sustained. The basic controversy was merely a dispute as to the validity of the contracts. The facts alleged were insufficient to show that they were invalid. Although plaintiffs sought different forms of relief, such as reformation of the contracts to conform to the statements made by defendant to the Real Estate Commissioner, the right to the return of moneys paid, and escape from numerous obligations imposed by the contracts, no facts were alleged which would have entitled them to have the contracts reformed or to call for any other form of equitable or legal relief. Plaintiffs have not suggested that they have any claims of right, or that the defendant has any duty, which could be the subject of a declaratory judgment if their contracts with the defendant are valid. The facts they allege, if proved, would not establish invalidity.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.